THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
RICHARD REEVES, Defendant-Appellant.

First District (1st Division)   No. 1—90—0394

Opinion filed April 20, 1992.

Randolph N. Stone, Public Defender, of Chicago (Rita A. Fry and Lynne Hubanks Miller, Assistant Public Defenders, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Veronica X. Calderon, and Catherine A. Hufford, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Following a jury trial, defendant, Richard Reeves, was found guilty of the murder of Mario Fierro and sentenced to a prison term of 25 years. On appeal, defendant contends that: (1) the Illinois homicide act violates the United States Constitution; (2) the State failed to prove him guilty beyond a reasonable doubt; (3) the trial court erred in refusing to tender to the jury an instruction on involuntary manslaughter; (4) the State's cross-examination and closing argument substantially prejudiced him and deprived him of his constitutional right to a fair trial; (5) the State's questioning of him regarding his post-arrest silence was improper; (6) the State misstated the evidence during closing argument; and (7) the trial court failed to consider all relevant mitigating factors in sentencing him to a prison term of 25 years. For the following reasons, the judgment of the trial court is affirmed.

The record sets forth the following facts relevant to this appeal. On November 13, 1988, police found the body of Mario Fierro lying outside of the Fickle Finger Tavern, 2202 Chicago Road, Chicago Heights, Illinois. At trial, Janice Wiley testified on behalf of the State that on November 13, she was bartending at the Fickle Finger Tavern. Fierro was also there, and Betty Howell, the off-duty tavern manager, took a beer can away from him. Defendant then escorted Fierro out of the tavern. Wiley stated that prior to that, Fierro was not causing any disturbance within the bar and that he made no physical contact with Howell. Fierro was neither loud nor boisterous to

Wiley or to defendant. Wiley did not see any confrontation between defendant and Fierro before they went out of the front door.

On November 26, defendant came into the Fickle Finger and asked Wiley to call the police. She stated that he had heard the police were looking for him and he wanted to turn himself in to them. Wiley called the police and they came and arrested defendant. On cross-examination Wiley stated that she knew defendant lived next door to the tavern and had heard that occasionally he would be called upon to help remove unruly patrons. She, however, had never called defendant.

Betty Howell testified that on November 13, she arrived at the Fickle Finger at 8:30 p.m. Frank Guiliani entered and sat with her. She saw defendant in the tavern, whom she knew by the nickname "Crush." Howell had known defendant for about 30 years.

Howell saw Fierro standing in the middle of the bar and she thought he had had enough to drink because he was having difficulty walking. She told Wiley not to serve Fierro any more to drink and reached to take a beer can out of his hands.

At this point, defendant came over from the side of the bar to where she and Fierro were standing. Defendant did not say anything, he just pushed Fierro out of the door. Howell told defendant that she could handle the situation.

Howell saw defendant and Fierro exit the tavern, but did not see Fierro do anything to defendant. Defendant came back about 10 minutes later. Later that night, Howell learned that Fierro was dead.

On cross-examination, Howell stated that the owner of the tavern, Sam Paddy, had told the bartenders that if there is a disturbance, they should call the police, not defendant. She admitted that defendant was not employed by the Fickle Finger.

Frank Guiliani testified that on November 13 he went to the Fickle Finger at approximately 8:30 p.m. with Ray Cioe. About 25 minutes after he arrived, Guiliani saw defendant, whom he knew as "Crusher," enter the tavern. Guiliani had known defendant for three or four years.

At that time, there were about 20 to 25 people in the bar area. After about 30 to 40 minutes, Guiliani looked toward the door of the tavern and saw defendant and Fierro go out. They were holding each other by the arms and were facing each other. He thought he saw one of them swing a punch, but it could have been that they were grabbing ahold of one another. Fierro had his back to the door and went out first, as they twisted out of the door. Guiliani had not heard any

conversation between defendant and Fierro prior to the two of them going out of the door, nor had he seen Howell approach Fierro.

Guiliani opened the door and saw defendant and Fierro in the street. Fierro was on his knees and defendant was standing in front of him. They were both in the southbound lane of traffic closest to the tavern. Guiliani then saw that Fierro was facedown in the street. Defendant kicked Fierro in and around the head approximately three times.

Guiliani walked into the street and asked defendant to stop. He grabbed defendant by his left arm and told him that the guy had had enough and to let him off the street. Defendant then stopped. Guiliani turned around and walked back into the bar. He saw defendant, John Cordes and Kenny Tritt help Fierro off the street. Approximately 30 seconds elapsed between the time he went outside and returned to his seat at the bar.

When Guiliani left the tavern with Ray Cioe approximately 20 minutes later, he found Fierro lying facedown on the sidewalk in front of his car which was parked on 23rd Street. Guiliani checked Fierro's neck for a pulse, but found none. He noticed that Fierro's hands were turning blue, but did not move the body. He told Cioe to call an ambulance.

On November 17, Guiliani identified defendant from police photos and made a statement to police. On November 28, he identified defendant from a lineup. On cross-examination, Guiliani admitted that he was intoxicated on November 13. He admitted that at that time, he told police he did not know what had happened because he did not want to say anything.

On redirect examination, Guiliani stated that he never saw Fierro strike defendant or do anything to harm him. He testified that his ability to observe was not impaired by his intoxicated condition.

Revita Payne testified that she lives at One East 23rd Street, in the ground-level apartment, across the street from the Fickle Finger Tavern. On November 13, at approximately 10 p.m., she heard loud male voices coming from across the street and went to the window. She heard one man yell, "Stay the fuck out of here. Don't come back." She saw three men carrying Fierro and a fourth man standing with the group. Defendant carried Fierro's shoulders.

The men walked east on the sidewalk in front of the tavern, directly toward her window. She could see them clearly because of the street light at the north end of her building about 25 to 50 feet away. When the men approached the northbound lane of traffic, they dropped Fierro on the street. After a few seconds, the men walked

across the street carrying Fierro back toward the tavern and placed Fierro on the sidewalk. Then the men went back into the tavern. Payne called the police and told them that a man was lying in the street and needed assistance, but she gave them the wrong address.

Payne then went back to the window and saw two men exit the tavern and approach the body on the sidewalk. One man was the defendant. They picked up Fierro and moved him to the southeast corner of the tavern. Then the two men went back to the entrance of the bar and looked in the direction of the body. They then reapproached Fierro and moved him by kicking and pushing him westward. Defendant was kicking Fierro. Then they returned to the tavern.

Payne called the police again and gave them the correct address. She then returned to the window. After about a minute, defendant and another man came out of the bar and carried Fierro toward 23rd Street. At 23rd Street, they carried Fierro around the corner, out of her view. The men went back into the tavern and, within five minutes, the police arrived. On November 17, Payne identified defendant from police photos, and on November 28, she identified defendant from a lineup.

Lachom Madison, a Cook County sheriff's police evidence technician, testified that he arrived at the scene at approximately 11:50 p.m., after police arrived, and found Fierro lying on his back, next to a small pool of blood. A sheet covered his body. Madison learned that police had turned over the body. Madison saw blood exuding from Fierro's nose, a laceration on the bridge of his nose, and an abrasion on his chin. The body was warm to the touch.

Dr. Robert H. Kirschner, deputy chief Cook County medical examiner, testified that on November 15, he performed an autopsy on Fierro. Kirschner noted that Fierro was an Hispanic male approximately 47 years old, 6 feet tall, 168 pounds. Kirschner found numerous abrasions on Fierro's face and wrists and an injury indicating blunt trauma to the right side of his head. He found several hemorrhages inside of Fierro's head and a fracture of thyroid cartilage indicative of manual strangulation. Lab tests revealed that Fierro was intoxicated and had been using cocaine.

Kirschner determined Fierro's cause of death to be blunt trauma to the head in association with manual strangulation. Kirschner stated that Fierro suffered from a traumatic subarachnoid hemorrhage, which is a lethal injury. He stated that manual strangulation could be caused by being either kicked in the neck, put into a choke hold, or knocked down.

On cross-examination, Kirschner stated that a subarachnoid hemorrhage is typically a whiplash kind of injury consistent with having one's head knocked back very rapidly or having one's head jerked around suddenly to the side, and is not a likely result of falling to the ground. He stated that this injury would not necessarily be aggravated by alcohol and cocaine, because it is inoperable and always fatal.

Defendant testified on his own behalf. On November 13, defendant went to the Fickle Finger at approximately 7:30 p.m. Betty Howell, Frank Guiliani, and Ray Cioe came in about 45 minutes later. Guiliani was drunk and he slurred his words. Howell approached Fierro, stated that he had had too much to drink, and took his beer away from him. Defendant then approached Fierro, said "it's time to leave," and pointed Fierro to the door.

Fierro started walking toward the door. Defendant followed Fierro, then reached around and opened the door for him. Fierro stepped down to the sidewalk, turned and flipped a cigarette in defendant's face. Fierro swung at defendant and hit him, and defendant retaliated. The two men fought, rolled around on the ground, and then fell into the middle of the street. The fight lasted less than a minute. Defendant stated that "he didn't hit me as many times, probably," but that Fierro hit him in the face and in the arms and throat, and kicked at him in the groin area. Defendant stated that he fought to protect himself because Fierro attacked him. Defendant admitted that Fierro weighed less than he did. When the fight was over, Fierro lay face up on the ground. Defendant stated that he did not kick Fierro after the fight, but that during the fight he may have kicked him in the throat. Defendant stated that he did not intend to hurt or kill Fierro. When Fierro was lying in the street, defendant saw no indication that he was seriously hurt and likely to die.

After the fight, defendant, Cordes and T.J. Connelly picked up Fierro and moved him to the sidewalk. Then they all returned to the tavern. Defendant was inside for about 15 minutes when he heard someone say that they were calling the police. Then Connelly came in and stated that he had moved Fierro down into the dark spot of the building. Defendant went back outside and moved Fierro again, placing him under the street light on the northwest corner of the street.

On Monday, November 14, defendant spoke with Janice Wiley. On the following day, he left by bus for Galveston, Texas, to borrow bond money from friends. On November 23, while still in Texas, he called the Chicago Heights police and told them that he had punched and kicked Fierro, and that Fierro had died accidentally. He returned to

the Fickle Finger on Saturday, November 26. Wiley called the police, and defendant was taken into custody.

On cross-examination defendant stated that he did not see anyone else strike, kick or punch Fierro and admitted that he had done those things. Defendant admitted that no one in the tavern had asked for his assistance that night, and that he never saw Fierro strike Wiley or Howell or hurt anybody in the tavern. He denied that he repeatedly kicked Fierro in the face. He denied dropping Fierro in the street. He did not call the police on the following day, after he learned that Fierro had died, to report the incident as an accident. Defendant never told police he had acted in self-defense. He admitted that punching and kicking someone in the head could cause great bodily harm and stated that he was trying to hurt Fierro because Fierro was trying to hurt him. Defendant admitted that Fierro posed no threat to him while he was on the ground.

Jay Parsons testified on defendant's behalf as to his reputation. On cross-examination Parsons admitted that his statement that defendant had a good reputation in the community was based on his own opinion and not upon his conversations with others in the community.

At the jury instruction conference, defense counsel submitted instructions as to involuntary manslaughter. In rejecting the instruction, the trial court held that involuntary manslaughter was a lesser included offense of first or second degree murder.

The jury found the defendant guilty of first degree murder. Judgment was entered on the verdict, and following a hearing, the trial court sentenced defendant to a prison term of 25 years, to be followed by four years of mandatory supervision. Defendant's timely appeal followed.

■ Initially, defendant contends that the Illinois homicide statute (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1, 9—2) violates due process guaranteed by the constitution, because it improperly shifts the burden of proof to defendant to prove mitigating factors in order to avoid a conviction of first degree murder. Defendant's contention is without merit, as this court has repeatedly rejected this argument. *People v. Collier* (1992), 228 Ill. App. 3d 159, 161; *People v. Smallwood* (1991), 224 Ill. App. 3d 393, 409; *People v. Davis* (1991), 221 Ill. App. 3d 1023, 1027; *People v. Willis* (1991), 217 Ill. App. 3d 909, 577 N.E.2d 1215; *People v. Buckner* (1990), 203 Ill. App. 3d 525, 561 N.E.2d 335.

Next, defendant contends that the State failed to prove beyond a reasonable doubt that he caused the death of Mario Fierro. Defendant

argues that the testimony of State witnesses failed to show that Fierro's fatal injury was caused by the defendant's actions. Defendant argues that witness testimony is inconsistent regarding the time the events occurred and the cause of death.

The trier of fact has the responsibility of weighing the credibility of the witnesses and resolving conflicts and inconsistencies in their testimony. (*People v. Green* (1988), 179 Ill. App. 3d 1, 11, 535 N.E.2d 413.) On review, mere conflicting evidence does not constitute sufficient grounds for reversal, and a reviewing court will not disturb a verdict of guilty unless the evidence is so unsatisfactory as to justify a reasonable doubt as to defendant's guilt. (*People v. Young* (1989), 128 Ill. 2d 1, 51, 538 N.E.2d 461.) Once a defendant has been found guilty of the crime charged, the fact finder's role as weigher of evidence is preserved through a legal conclusion that upon judicial review all of the evidence is to be considered in the light most favorable to the prosecution. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

■ Dr. Kirschner testified that Fierro's death was caused by blunt trauma in association with manual strangulation. Defendant argues that this testimony supports the conclusion that defendant could not have caused Fierro's death because no witness saw defendant strangle Fierro. Defendant's argument is without merit because Kirschner testified that manual strangulation could be caused by being kicked in the neck, put into a choke hold or knocked down. The record shows that defendant kicked Fierro. Defendant admitted that he kicked Fierro, and Guiliani testified that defendant kicked Fierro three times in the head and neck area.

Defendant further argues that witness testimony reveals an inconsistency in the time the events occurred, supporting the conclusion that defendant's actions could not have been the cause of Fierro's death.

The record indicates that Guiliani arrived at the Fickle Finger at approximately 8:30 p.m. and that defendant arrived approximately 20 to 25 minutes later. Thirty to forty minutes later, Guiliani saw defendant and Fierro standing by the door, facing each other, and holding each other by the arms. He then saw the two of them "twist" out of the door. When Guiliani left the tavern approximately 20 minutes later, he found Fierro lying near his car. The police arrived immediately thereafter.

Revita Payne testified that she first heard loud voices at approximately 10 p.m., and that the police arrived five minutes after she saw the men move Fierro around the corner out of her line of sight. Lachom Madison testified that he arrived at the scene at 11:50 p.m., af-

ter police had already been there. He found Fierro's body covered with a sheet lying face up and learned that police had turned over the body. Madison stated that Fierro's body was warm to the touch, but did not state how long the body had been there or the approximate time of death. Dr. Kirschner stated that Fierro's injury was lethal, not "immediate," as defendant argues. The minor inconsistencies in witness testimony regarding the exact time of the incident do not render the evidence so unreasonable, improbable or unsatisfactory as to justify this court's reversal of the jury's determination of guilt beyond a reasonable doubt.

In addition, defendant contends that the State failed to prove he acted without legal justification in fighting with Fierro. Defendant testified that Fierro flipped a cigarette in his face, swung at him and hit him. Defendant admitted to swinging at and kicking Fierro, but contends his actions were in self-defense. Defendant also admitted that he weighed much more than Fierro and that he had not seen Fierro threaten or attempt to hurt anybody in the tavern. Defendant further asserts that the evidence disclosed that he had a good reputation in the community. Defendant contends that because no witness could refute his testimony, he was not impeached as to the issue of self-defense. However, defendant offers no support for his contention.

Self-defense is an affirmative defense, and unless the State's evidence raises the issue involving the alleged defense, the defendant bears the burden of presenting evidence sufficient to raise the issue. *People v. Everette* (1990), 141 Ill. 2d 147, 157, 565 N.E.2d 1295; Ill. Rev. Stat. 1987, ch. 38, pars. 3—2, 7—14.

The State's evidence does not raise the issue of self-defense. The record indicates that Guiliani's testimony contradicts defendant's testimony. Kirschner stated that Fierro had numerous abrasions on his face and wrists and that his fatal injuries were consistent with being punched, kicked, or knocked down. Parsons did not know defendant's reputation in the community, but testified based on his own personal opinion of defendant. Defendant has not presented evidence sufficient to raise the issue of self-defense. Therefore, defendant has not shown that the State failed to meet its burden of proof that defendant acted without legal justification.

Defendant further contends that he did not have the requisite mental state for a conviction on first degree murder. Defendant testified that he did not intend to hurt or kill Fierro, and he did not think Fierro was seriously hurt or would die. Defendant contends that he moved Fierro to a lighted area so he could be found and helped.

The requisite mental state may be inferred from the defendant's conduct and circumstances surrounding his commission of the crime. (*People v. Terrell* (1989), 132 Ill. 2d 178, 204, 547 N.E.2d 145.) To prove the crime of murder, it is not necessary to show that the defendant has a specific intent to kill or do great bodily harm or that he knows with certainty that his acts will achieve those results. Rather, the necessary mental state may be inferred from evidence that the defendant voluntarily and willfully committed an act, the natural tendency of which was to destroy another's life. (*People v. Bartall* (1983), 98 Ill. 2d 294, 307, 456 N.E.2d 59.) Disparity in size and the strength between the defendant and the victim, and the nature and extent of the victim's injuries, are relevant circumstances in ascertaining whether the defendant possessed the necessary mental state. *People v. Brackett* (1987), 117 Ill. 2d 170, 179-80, 510 N.E.2d 877.

■ Dr. Kirschner stated that Fierro died as a result of blunt trauma to the head resulting in a subarachnoid hemorrhage, and a fracture of the neck, indicative of manual strangulation. Dr. Kirschner further stated that such injuries could have been administered by fists or kicks.

The record further shows that defendant, at 250 pounds, was significantly larger than Fierro, who weighed 168. Defendant admitted that Fierro did not pose a threat to him while he was lying on the ground. Defendant also admitted that he was trying to hurt Fierro because Fierro was trying to hurt him and that he may have kicked Fierro in the throat. Thus, the evidence supports a finding of guilty beyond a reasonable doubt.

Defendant next contends that the trial court erred in refusing to instruct the jury on the lesser offense of involuntary manslaughter. Defendant argues that from the evidence, the jury could have believed Fierro's death to have been accidental resulting from reckless acts, and that the jury should have been instructed accordingly. In response, the State argues that there is no credible evidence demonstrating that defendant's acts were reckless or that Fierro's death was accidental.

On review, a court will not substitute its judgment for that of the trial court unless the trial court's determination is so unsatisfactory as to justify a reasonable doubt as to the defendant's guilt. (*People v. Young* (1989), 128 Ill. 2d 1, 51, 538 N.E.2d 461.) Murder and the lesser included offense of involuntary manslaughter are distinguished only in terms of the mental state required. Murder requires the intent to kill or do great bodily harm or knowledge that the acts create a

strong probability of such result, while involuntary manslaughter requires only reckless conduct which causes death. (*People v. Austin* (1990), 207 Ill. App. 3d 896, 899, 566 N.E.2d 492.) Credible evidence in the record which would reduce murder to manslaughter entitles an accused to a manslaughter instruction. An involuntary manslaughter instruction, however, should not be given if there is no evidence which would reduce the crime to manslaughter. (*People v. Ward* (1984), 101 Ill. 2d 443, 451, 463 N.E.2d 696.) The instruction is unnecessary when the nature of the defendant's conduct is of such a character as to defeat any assertion of reckless or inadvertent conduct. (*People v. Trotter* (1988), 178 Ill. App. 3d 292, 298, 533 N.E.2d 89.) Death may be the natural consequence of blows with bare fists where there is great disparity in size and strength between the two parties. *People v. Brackett* (1987), 117 Ill. 2d 170, 180, 510 N.E.2d 877, 882.

Defendant's reliance on *People v. Taylor* (1991), 212 Ill. App. 3d 351, 570 N.E.2d 1180, is unpersuasive as the facts are distinguishable. There, the court reversed defendant's conviction, holding that the evidence showed that the victim died as a result of falling and hitting the concrete, not as a result of defendant's blow. *Taylor*, 212 Ill. App. 3d at 357.

■ In the present case, the medical evidence shows that Fierro died as a result of blunt trauma to the head and manual strangulation, resulting from kicking in the head and neck area or a choke hold around the neck. The jury could infer from the disparity in the sizes of defendant and Fierro that the two would not be evenly matched in a fight. Further, the intent to kill or do great bodily harm may be inferred because of the severity of the injuries Fierro received. Based on the evidence presented at trial, the trial court properly denied an instruction on involuntary manslaughter.

Next, defendant contends that various questions asked by the prosecutor on cross-examination were improper and denied him a fair trial. Defendant objects to the following question:

> "PROSECUTOR: And in fact, sir, please tell the ladies and gentlemen of the jury one person who can substantiate him hitting you."

Defense counsel's objection to the question was sustained.

The State responds that the prosecutor was merely questioning the credibility of defendant's case, illustrating that defendant's defense was inconsistent with the testimony and evidence presented. The State argues that the prosecutor's comments specifically responded to statements made by defense counsel during opening statement:

"You will also hear evidence from the testimony of State's witness [*sic*] that Mario also swung at Richard Reeves and punched him."

■ The latitude to be allowed on cross-examination is within the sound discretion of the trial court, and a reviewing court should not interfere unless there has been a clear abuse of discretion resulting in manifest prejudice to the defendant. (*People v. Collins* (1985), 106 Ill. 2d 237, 269, 478 N.E.2d 267.) In general, any permissible kind of impeaching matter may be developed on cross-examination, since one of the purposes of cross-examination is to test the credibility of the witnesses. (*Collins*, 106 Ill. 2d at 269.) In the present case, any impropriety was cured when the court sustained defendant's objection. *People v. Eichelberger* (1989), 189 Ill. App. 3d 1020, 546 N.E.2d 274.

■ Defendant also objects to subsequent cross-examination regarding whether anyone saw Fierro hit defendant. Defendant's failure to object at trial waives this issue for purposes of review. *People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124.

Defendant further contends that he was prejudiced by various comments made by the prosecutor during closing argument. The State responds that the comments were proper, as they were invited by the defense counsel's closing argument, and were legitimate inferences based on the evidence presented at trial.

A prosecutor is given great latitude in closing argument, and the propriety of his comments is within the trial court's discretion. (*People v. Morrison* (1985), 137 Ill. App. 3d 171, 184, 484 N.E.2d 329.) It is well settled that the prosecution has the right to comment on the evidence that has been adduced at trial and make all legitimate inferences therefrom. (*People v. Wheatley* (1989), 183 Ill. App. 3d 590, 601, 539 N.E.2d 276.) Improper prosecutorial remarks generally do not warrant reversal unless they are so prejudicial as to constitute such a material factor in defendant's conviction that the jury likely would have reached a contrary verdict had the remarks not been made. (*People v. Townsend* (1985), 136 Ill. App. 3d 385, 394, 483 N.E.2d 340.) Comments by the prosecution in rebuttal argument that are invited by defense counsel's closing argument are proper. (*People v. Perez* (1983), 113 Ill. App. 3d 143, 149, 446 N.E.2d 1229.) Moreover, a defendant is not denied a fair trial where the jury is admonished that the opening and closing statements are not evidence. *People v. Thomas* (1990), 137 Ill. 2d 500, 530, 561 N.E.2d 57.

■ In the present case, defense counsel stated in opening that the State's witnesses would testify that Fierro punched defendant. The record shows that defendant failed to elicit this evidence at trial.

In his closing argument, defense counsel alluded to witnesses who saw Fierro punch defendant. The prosecutor properly responded to these remarks during rebuttal. The record also reveals that the trial court admonished the jury that closing arguments are not evidence and that the burden of proof remained on the State. Accordingly, even if the comments were improper, they would not have changed the outcome of the trial, and are, therefore, harmless error.

Defendant further contends that the prosecutor's cross-examination regarding his failure to report the incident to the police on November 13 was improper, in that the prosecutor commented on defendant's post-arrest silence. Defendant objects to the following questioning:

"PROSECUTOR: And you stated that you learned within one day that the person you got in a fight with had died, right?

DEFENDANT: Yes, sir.

PROSECUTOR: Did you pick up the phone, call the police and state, hey, it was an accident?

DEFENDANT: No, I did not.

PROSECUTOR: Did you call up, pick up the phone, call the police and say, I know something about it?

DEFENDANT: No, I did not.

PROSECUTOR: You got on a bus and you left town, right?

DEFENDANT: Yes.

PROSECUTOR: And I believe you stated you left town to get bail money; is that right?

DEFENDANT: Yes.

PROSECUTOR: And you never told the police that, hey, it was self-defense, right?

DEFENDANT: I never told them anything."

■ The prosecution may pursue a line of inquiry which defendant has invited and he may not complain of testimony on cross-examination elicited by defense counsel. (*People v. Pegram* (1987), 152 Ill. App. 3d 656, 662, 504 N.E.2d 958.) On direct examination, defendant testified that he left town without reporting the incident. Defendant's testimony above revealed that he did not say anything to the police on November 14, the day after the incident. Defendant was arrested on November 26. The above questioning was proper because it pertained to defendant's prearrest statements, or lack thereof, not post-arrest statements.

Defendant also contends that the prosecutor misstated the evidence during closing argument. Defendant argues that the prosecutor's comments, that "He said what he did caused that death" and

"he admitted, during his testimony, that his intent was to cause great bodily harm," misstated defendant's testimony. The State responds that defendant's contention is waived for failure to object at trial under *People v. Enoch.* Even if defendant's contention is not waived, we find no error.

Generally, assumptions and statements of fact not based on evidence in the case may not be argued to the jury and may be deemed prejudicial to the accused. Nonetheless, arguments based on facts appearing in proof or on legitimate inferences from those facts are proper. (*People v. Burgos* (1989), 184 Ill. App. 3d 474, 480, 540 N.E.2d 456.) The character and the scope of arguments to the jury are left to the discretion of the trial court, and its ruling should be upheld unless the court clearly has abused its discretion. *Burgos,* 184 Ill. App. 3d at 481.

The record supports the fact that the State's comments are proper inferences from the evidence. Defendant's intent to do great bodily harm was elicited during his cross-examination when he stated that he was trying to hurt Fierro because Fierro was trying to hurt him. Defendant further testified that he did not see anyone else strike, punch or kick Fierro and that as far as he knew, he was the only one who struck Fierro. Although defendant denied any intention to kill or hurt Fierro, he admitted on cross-examination that kicking and punching a person in that manner would hurt him.

Finally, defendant contends that the trial court failed to consider all relevant mitigating factors in determining his sentence. The trial court is the proper forum in which a sentence is to be determined, and the trial judge's decision regarding sentencing is given great weight and deference. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 153, 368 N.E.2d 882, 884; *People v. La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 344.) It is well established that the imposition of a sentence is a matter of judicial discretion and that, absent an abuse of that discretion, the sentence as determined by the trial court should stand. (*Perruquet,* 68 Ill. 2d at 153.) Defendant has failed to show that the trial court erred in sentencing him to a prison term of 25 years.

For the above reasons, the judgment of the trial court is affirmed.

Affirmed.

O'CONNOR and MANNING, JJ., concur.